## N. Y. SUPERIOR COURT.

PETER HAACK agt. HENRY S. FEARING.

In an action for damages for a personal injury received by the plaintiff from the wadding of a cannon negligently discharged on board of a pleasure yacht of the defendant, by one of its crew during the absence of the defendant, and in viola-
· tion of his positive general order, the plaintiff cannot sustain his action, where there is no evidence that the cannon was fired in the course of any employment or duty of the master of the yacht; but merely as a salute to another yacht, in passing.

Neither can the action be sustained on the ground that in permitting the master of the vessel to have the possession and custody of the gun and ammunition, with other equipments of the yacht, the defendant became responsible for their careless use. Such possession and control cannot create or imply permission, much less authority or duty to use them in the face of positive orders of the defendant to the contrary.

The defendant, under the doctrine of liability of master and servant, would have been liable, if the sailing-master had injured a person or vessel by *careless naviga-tion* of the yacht under his charge, as that would have occurred while performing the duty and ordinary employment of a sailing master.

It could not be any part of the duty of sailing or taking care of the yacht, to dis-charge signal guns or give salutes. (McCUNN, J., *dissenting: Holding that it became a part and parcel of the duties of a pleasure yacht crew, and a universal cus-tom, to observe all those amenities and civilities which can by possibility pass between gentlemen able to afford such luxuries, and which are expected to be exchanged; such as salutations by displaying flags, firing guns, and exchanging other courtesies, &c.*)

*General Term, October,* 1867.

THIS was an action for damages, for a hurt received by the plaintiff in July, 1866, from the wadding of a cannon negligently discharged on board of a vessel or pleasure yacht (the Rambler) of the defendant, by one of its crew during

the absence of the defendant. The signal of the New York Yacht Club was generally used on board of such vessel, which indicated that she belonged to the squadron of that body, but there was no other evidence offered on the trial of its being so. On the occasion in question the gun was discharged about two or three o'clock in the afternoon of a day in July, 1866, while the vessel in question was being towed by a steamtug to her anchorage near Hoboken, where other yachts were lying. The plaintiff received the injury while on board of a ferry boat, passing between the yacht in question and the shore. A witness (Smith) testified on the trial that he has not often seen yachts come to that anchorage without firing a salute. It was usual for them to do so. It was customary, but not always done. But finally said that he knew nothing as to the custom in firing salutes. Some did it and some did not. Another witness (Morrill) only knew of such a custom up to 1859. The vice commodore of such club squadron (Major), when the accident happened, testified that there was no rule of that club which had any bearing as to firing salutes, and no universal custom by any means of firing guns by yachts while approaching their anchorage; "that it was" a thing done by some persons and not by others; that yachts sometimes saluted on meeting and sometimes not.

He also testified that the firing of salutes did "not come under the scope of the general duty of a sailing-master;" that it did "not come under his supervision unless he had been particularly requested so to do;" there was no duty of his as to firing salutes, except to obey the orders of his superior officer. A rule of such yacht club (14), for setting colors in the morning and lowering them at sunset, when two or more yachts sailed in company or were at anchor in sight of each other, was the only one as to firing guns. It prescribed that in such case the time for so hoisting or lowering colors should be taken from the senior officer in command, and that no guns should "be fired in setting or hauling down

Haack agt. Fearing.

the colors, except by the yacht giving the time. This was all the evidence on the trial as to the duty or any custom of firing guns on anchoring or meeting another yacht, or on another occasion. The mate of the yacht in question (Hoffman), who was examined as a witness for the plaintiff on the trial, testified that when the gun was fired he was getting the anchor ready to drop it. That two years previously (being shortly after the yacht was built), because a man had been hurt by discharging such gun, the defendant gave general strict orders to all the crew not to fire any guns unless he was on board; and again in the previous summer at New London, such orders were known to all on board of the boat. They had fired such a gun a dozen times when approaching such anchorage while the defendant was on board; they sometimes fired it and sometimes not; they fired it off once or twice without the knowledge of the defendant. He was not on board at the time of the accident in question. Such witness testified that he supposed it was fired to salute the yacht Wave, and not the tugboat which blew its whistle; and that they had orders not to use any wadding in firing guns. The plaintiff was injured by the wadding. On the trial the defendant's counsel moved to dismiss the complaint, which motion was granted, and the exceptions taken thereto, and on the trial ordered to be heard, in the first instance, in general term.

Mr. CADWALADER, *for defendant.*
Mr. COUDERT, *for plaintiff.*

ROBERTSON, C. J. I have not been able to find any evidence in this case that the gun, whose discharge caused the injury to the plaintiff, was fired in the course of any employment or duty of the master of the vessel in question. It was not necessary in the course of its navigation, or as a matter of duty to other vessels, or in compliance with any custom governing vessels in general in New York harbor, or yachts

belonging to the New York Yacht Club Squadron, if the vessel in question belonged to that squadron, or was bound by the rules of that club, of which there does not seem to have been sufficient evidence. So that the ground of the defendant's liability is reduced to the question, whether, by merely permitting the master of the vessel to have the possession and custody of the gun and ammunition, with other equipments of the vessel, the defendant became responsible for their careless use. In the case of *Lambt* agt. *Lady Polk* (9 *Car. & P.* 629), the defendant was held not liable for the negligence of her coachman, who, after descending from his box, had, in turning aside the head of a horse harnessed to a van which obstructed his passage, precipitated a box of mineral waters from such van upon the shafts of the plaintiff's gig and broke them, because the act was not done in the course of the coachman's employment for the defendant. In the case of *Mitchell* agt. *Crassweller* (13 *C. B.* 237, 16 *Eng. L. Eq.* 448), it was held that for an injury done by the negligence of the defendant's carman to a third person, in driving his employer's horse and cart, for his own private purpose, after the time when he should have, and usually did, put up such horse and cart in their stable, the employer is not responsible. In the case of *Joel* agt. *Morrison* (6 *Car. & P.* 501), and *Sleath* agt. *Wilson* (9 *J.* 607), it was conceded that if a servant drives for his own purposes his master's carriage withouf leave during the time it is not in use for the business of the latter, the master is not liable for any injury caused by its means while so driven. Although, in both, it was held that if while driving for his master's business, the servant merely make a detour for his own purposes, his master is responsible for his negligent driving during such deviation. That distinction is made in both such cases to rest on the fact that, in the latter event, the master has enabled the servant to do the injury, by the mismanagement of the carriage while intrusted with its use for the master's benefit. That doctrine would have applied in this case, if the sailing-

master had injured a person or vessel by careless navigation of the vessel under his charge. The mere possession and control of the gun and ammunition could not create or imply permission, much less authority or duty to use them in the face of the positive orders of the defendant to the contrary. It could not be any part of the duty of sailing or taking care of the vessel to discharge signal guns or give salutes, and there was no evidence of a uniform custom on the part of the vessel in question, or any other yachts, or of any regulation to that effect in the squadron to which it was supposed to belong, to make it part of the ordinary employment of the sailing-master. I apprehend there is no difficulty in a general limitation of the extent of the employment of a servant by agreement or command, so as to prevent him from doing ac s of a particular character. It is true that the prohibition of specific acts within the scope of a general employment on a particular occasion only, or of a particular mode of doing them may not exempt the employer from liability. But prohibiting their being ever done must certainly curtail the extent of the employment; and the language of Justice STORY (*Agency*, 452), in declaring the liability of a principal, notwithstanding his prohibition of the acts of his agent, by which third parties are injured, must be construed in that sense. The case of the *Philadelphia and Reading Railroad Co.* agt. *Derby* (14 *How., S. C.* 295), also can only extend that far, otherwise it is contrary to several of the very cases cited in the opinion there delivered.

I am not aware of any principle which justifies the use by a party of a prior written statement of a witness of such party to instruct him what to say, under pretext of refreshing his memory when he has not shown any weakness of recollection. The case of *Guy* agt. *Mead* (22 *N. Y. R.* 462), cited for the purpose, does not sustain any such proposition, and the attempt to do it on the trial was properly prevented. I do not understand the question put to a witness as to the extent of the orders given by the defendant as calling for his

construction of their language, but his recollection of it. He had not previously undertaken to give their precise words. It was, therefore, properly admitted. There being no error committed on the trial, the exceptions should be overruled and judgment given for the defendant dismissing the complaint on the merits, with costs.

McCUNN, J. (*dissenting.*) I regret I must dissent in this case. On the 30th of July, 1866, as the yacht Rambler, of the New York yacht squadron, was about to drop anchor at her rendezvous in the waters of the Hudson, she fired a salute of one gun to the other yachts of the squadron. The wadding of the gun struck and penetrated the side of the ferry boat, on which plaintiff was sitting, knocking him down, breaking his arm and rendering it useless for life. This action is brought against the defendant, the owner of the yacht, to recover compensation for the injury. It appears in the evidence that, in the harbor of New London and in the harbor of Newport, two years previous to the accident, instructions were given by Mr. Fearing, the owner, that no firing should take place on board his yacht, unless he was present, or unless he ordered it to be done. That on the morning of the accident, Mr. Fearing quitted his yacht at Staten Island, and left her in command of a person named Smith, whom he called his sailing master, and directed Smith to proceed to the rendezvous. That Smith, on arriving at such rendezvous, ordered the customary salute to the other yachts, without receiving instructions from Mr. Fearing. On this state of facts, a nonsuit was ordered by the learned judge below, on the ground that "plaintiff had shown no facts to render the defendant liable." I am clearly of opinion that error was committed in granting such nonsuit.

On the trial of the action, an effort was made on the part of the defendant to establish the fact that the witness Smith was not the captain, but the sailing master of the yacht.

This is of little consequence; indeed, it is quite immaterial whether Smith was known as captain or as sailing master. It is admitted that when Mr. Fearing quit his yacht at Staten Island he placed Smith in the entire command of the ship, and that she was absolutely under his supreme control; and I hold that Mr. Fearing, the defendant, under the circumstances, is liable for the act of Smith in negligently firing the gun. It is a sound maxim in law, that when a party is injured by the negligence of another, the person causing the injury shall be held strictly accountable, unless the party injured contributed to the accident, which was not the case here. There is no pretence that plaintiff was in the slighest degree negligent. On the contrary, he was sitting in the cabin of the ferry boat, on his way from New York to his home in Hoboken, when this shot plunged through the side of the boat and caused the injury which has invalidated him for life. Surely, if courts are intended to afford a remedy for gross negligence, there never was a case in which the refinements of the law should be brought to bear by the judges to enforce such remedy more than in this case. The plaintiff had been attending his daily toil, and was returning to his family, secure, as he thought, in all things which render life safe, when this defendant and his servants, after returning from a trip of pleasure, in the most negligent and careless manner did an act which resulted in the injury. A glance at the evidence must convince an ordinary mind that it was not only carelessness, but carelessness of the grossest kind.

The act of Master Smith in firing the gun was within the strict line of his duty, and the defendant Fearing, by placing Smith in command of his yacht and in the possession of the implements to do wrong, rendered himself liable; for I lay it down as a broad, general principle, that wherever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must suffer. In treating the question herein, we are compelled to

withdraw ourselves from the ordinary method of looking into such cases, because the facts and circumstances are not altogether within the scope of ordinary business transactions. For instance, this was a pleasure yacht; she was the means adopted by her opulent proprietor to gratify his tastes; and all those amenities and civilities which can by possibility pass between gentlemen able to afford such luxuries are expected to be exchanged, such as salutations by displaying flags, firing guns, and exchanging other courtesies, and which, I hold, become a part and parcel of the duties of the yacht crew. The vice commodore of the squadron testifies, "that the salute to the flag (the one causing the injury) was in accordance with the rules of the club," and the club rules declare such amenities and civilities to be a part of their duties. If such civilities are not part of the ordinary duties of a pleasure yacht and her crew, then it is hard, indeed, to say what their legitimate duties are; they do not engage in commerce, they do not contribute to the welfare or happiness of the community in general, but to the pleasures of the few who associate together; and their polite courtesies to each other, I hold, is part of their legitimate business; and, when they commit an error or a wrong, in carrying out these pleasures, upon one of the community, they should be held strictly accountable.

Once at Newport, in firing a salute from the same yacht, a similar accident occurred, and then it was admitted that Smith was acting within the limits of his duties, and it was because Mr. Fearing believed that the firing at Newport was part of the duties of his crew that he forbade firing thereafter unless he was on board or gave special directions to do so. Indeed, the fact that the firing was specially prohibited, unless at certain times, is the strongest evidence that it was within the ordinary bounds of the crew's duty; else why prohibit it? Smith had been the commander and sailing master of the yacht for years past, and he knew well what his duties were; and if the firing had not been a part of his duties,

even without instructions from Fearing, it must be presumed he would not have fired the gun. But it is manifest that it was because he believed he was performing his duties that he tendered this salute to the squadron. It must, therefore, be taken for granted that the act of Smith, whereby the accident occurred, was strictly within the line of his duties, notwithstanding he was forbidden to perform it; and it is an elementary principle that you cannot bind innocent and third parties, who have been injured, by proving private instructions to servants not to perform certain acts, acts ordinarily performed within the line of their duties.

After having said thus much as to what their legitimate duties are, let us see whether Mr. Fearing would not be held liable for acts done by his commander, which injure others, even if those acts had been some two years before prohibited. Suppose Captain Fearing to be on board his yacht, his sailing master, Smith, in command of the vessel, the wind abeam; and another vessel is seen approaching in directly the opposite course, having the wind also on her beam, and the ships are meeting end on, and Captain Fearing gives the command to put the helm to port, which is the proper command, the other vessel having received the like command, and, instead of putting the helm hard to port, Smith, the sailing master, in the face of Mr. Fearing's command, puts his helm hard a starboard, and a collision takes place; Mr. Fearing or his vessel would certainly be held liable for the injury to the other vessel; because article 2 of an act fixing rules and regulations for preventing collisions on water, passed April, 1864 (and which, by the way, is now the sailing regulation of all the world), declares, " if two sailing vessels are meeting, end on or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other." Now, this is the aptest kind of an illustration; and if Mr. Fearing had been absent from his vessel, and the sailing master had, after receiving positive instructions from Mr. Fearing to obey

the law in relation to putting his helm to port, instead of putting his helm to port, put it hard to starboard, thereby causing the collision, surely the absence of Mr. Fearing would not have exonerated his vessel or himself from liability, more than if he had been on board; and certainly the law will hold Mr. Fearing strictly liable for the acts of his sailing master in firing this gun improperly, as much as it would for the act of such sailing master in disobeying his orders, as I have illustrated above.

I might stop here without citing a single authority, because I hold that judges are not bound to treat the court as a thing of words, dates, readings and decisions, but as a living fact, in close relation to other living facts, and having in itself the germs of growth and change; and I would be justified in saying, without adding another word, that the judgment below should be reversed and a new trial ordered. But let us see what some of the most eminent elementary writers and some of the ablest decisions say upon this question. One of the earliest cases in the books, and one directly in point, is to be found in the first volume of decisions of Lord MANS-FIELD, by *Evans, page* 98. That was the case of the capture of a ship by the enemy, where it was agreed between the captors and the captain of the captured ship that one of the sailors should be retained as a hostage until the ransom fixed by the captain with the enemy for the ship should be paid. The sailor consented to be retained or imprisoned by the enemy, provided that the owners of the captured ship would, during his captivity, pay his regular wages, which was agreed to by the captain. The captain brought the ship home, but the agreement on his part with the captors was repudiated by the owners, and the ship was sold for the benefit of the captors. After the seaman obtained his liberty he returned and sued the owners for his wages during his imprisonment. The answer set up was, that the captain had no authority to bind the owners in such a case, and that his doing so was illegal and entirely without the line of his duties, and con-

trary to the statute law of England. Lord MANSFIELD, delivering the opinion of the court, held that, although it was not within the strict line of his ordinary duties, and although the law forbade the captain doing so, yet, as the captain believed he was doing his duty when ransoming the ship, and upon principle, he should recover. And this decision was coincided in by all the legal minds of the day. Now, there was an unlawful act perpetrated by the captain, an act forbidden by his owners and by the law of the land, and one which might be considered entirely beyond the line of his duty; and yet, because the sailor was injured by detention, and because the captain had it in his power so to stipulate, it was held he could recover. The next case of any moment we find in the English books is that of *Sleath* agt. *Wilson* (*9th Car. & Payne*, 612), decided by Lord ERSKINE, wherein that able jurist held "that whenever the master intrusted the servant with the control of the horses and carriage, it is no answer that the servant acted improperly in the management of it." "If it were, proceeds that learned judge, "it might be contended that, if a master directs his servant to drive slowly, and if the servant disobeys his orders and drives fast, and through his negligence occasions an injury, the master will not be liable; but (saith Lord ERSKINE) that is not the law; the master in such a case will be liable, and the ground is, that he has put it in his servant's power to mismanage the carriage by intrusting it with him," and he therefore held that defendant should be held liable.

Now, the case at bar and the one last cited are very similar, notwithstanding the fact that the instruments working the injury were very dissimilar, the one being a servant and a pair of horses, and the other being a servant and a yacht. Both disobeyed the instructions of their masters, and both thereby caused injury to the plaintiffs in the different actions. One disobeyed his master's directions in taking the horses back to their stable out of their usual way, to perform

errands of his own; the other, when taking the yacht, at his master's request, to her usual rendezvous, fired a salute which he was not instructed to fire, thereby causing the injury. The principles involved are precisely similar, and the ruling in the one case should govern the ruling of the other.

The rule that the master shall be liable for the tortious acts of his servant is of universal application. The maxim is *"respondeat superior."* If the act be done in the course of his employment, the master is liable, even if he forbade the act to be done. Such was the decision of Mr. Justice GRIER, in the case of *Derby* agt. *The Philadelphia and Reading Railroad Co.* (14 *How. U. S. S. C. R. p.* 483), where the question came fairly up, and where the doctrine I contend for was reviewed and reaffirmed in the most explicit terms. Derby had sued the company for injuries to his person; the locomotive causing the injury was run by an engineer employed by the road, who had express instructions not to run his engine on the road that day. Contrary to such instructions, he ran his engine, and in doing so injured plaintiff, and the company was held liable. Now the case of Derby is precisely similar to the one at bar; there the engineer was on that day expressly forbidden to run his engine on the track; he did run her, and caused the injury, and the company was held liable. Here the sailing master had received instructions two years previous not to fire salutations without permission; while in his master's employ, in bringing up the yacht to her place of destination, he did fire one which caused the injury, and his employer should be held liable. In some of the cases cited on the defendant's points, and in others not on his points, there are to be found *dicta*, which, when severed from the context, might seem to countenance. the doctrine that the master is not liable if the servant act in disobedience of his orders; but it will be seen on a careful examination that the question depended on whether he was or was not, at the time, in the relation of master and ser-

vant; and I know that in some of those cases some subtle and astute distinctions are drawn as to when the servant is acting in his master's employ; yet I can find no case contrary to the views expressed above. The elementary writers all agree that the master is liable for the acts of his servant, although those acts may be contrary to his orders.

· Judge STORY, in his treatise on *Agency*, says that the master must be held liable in civil suits for "the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasance or malfeasances and omissions of duty of his agent, in the course of his employment, although the principal did not authorize, or justify, or participate in, or indeed know of, such misconduct, or even if he forbade the acts." Chancellor KENT, in his *Commentaries*, holds the same rule; and both of these eminent writers cite a large number of authorities in support of their views. (*Story on Agency, p. 537, notes* 1, 2 *and* 3.)

It cannot be said in this case that Smith was not acting in the line of his duty when he fired the gun; he was. He was bringing the yacht to the place where his master directed him to bring her; he was in sole command, and was manœuvring her, exchanging courtesies and salutations with other vessels, all of which was in the strict line of his duty. One act of his duty he was directed, two years before, to omit; he did not omit, but committed the act, and did it so negligently that he injured others. Now, as I have said before, all wrongs have remedies in law, and, pray, where is the remedy here? Who is to compensate this innocent man for the great injury and wrong he has suffered, without the slightest negligence on his part? Not the ferry company, who were carrying him to his home, and who did not contribute to the negligence. It is idle to answer that the plaintiff may have recourse to Smith, when the law gives him the option to sue either the master or the servant. Smith's responsibility is not so apparent as that of the owner of the yacht; but, however that may be, the plaintiff, in the

exercise of an election accorded him by the law, has chosen to come against the principal. Instead of turning the plaintiff round to Smith, the defendant, as principal, may seek indemnity for any damages he may sustain in this action, by a suit against his agent for disobedience of his instructions.

The judgment should be reversed and a new trial ordered.